[No. 37028. Department Two. April 23, 1964.]

THE STATE OF WASHINGTON, *Appellant*, v. ERNEST LOERTSCHER *et al.*, *Respondents.**

*Reported in 391 P. (2d) 520.

The *Attorney General, Richard C. Nelson* and *Lloyd W. Peterson, Assistants,* for appellant.

*O'Leary, Meyer & O'Leary* and *Brodie, Fristoe & Taylor,* for respondents.

FINLEY, J.—In this lawsuit the state of Washington is suing two individuals, a landowner and a logging operator, to recoup $10,512.02 in fire fighting costs incurred by the state in suppressing a 156-acre fire on timberland located in Mason County. The claim of the state is based solely on provisions of the *slash statute*, RCW 76.04.370, which reads:

"Any land in the state covered wholly or in part by inflammable debris created by logging or other forest operations, land clearing, or right of way clearing and which by reason of such condition is likely to further the spread of fire and thereby endanger life or property, shall constitute a fire hazard, and the owner thereof and the person responsible for its existence shall abate such hazard. If the state shall incur any expense from fire fighting made necessary by reason of such hazard, it may recover the cost thereof from the person responsible for the existence of such hazard or the owner of the land upon which such hazard existed, and the state shall have a lien upon the land therefor enforceable in the same manner and with the same effect as a mechanic's lien. Nothing in this section shall apply to land for which a certificate of clearance has been issued.

"If the owner or person responsible for such hazard refuses, neglects, or fails to abate the hazard, the supervisor may summarily cause it to be abated and the cost thereof may be recovered from the owner or person responsible therefor, and shall also be a lien upon the land enforceable in the same manner with the same effect as a mechanic's lien. The summary action may be taken only after twenty

days' notice in writing has been given to the owner or reputed owner of the land on which the hazard exists either by personal service or by registered letter addressed to him at his last known place of residence."

The defendant-respondent landowner, Ernest Loertscher, was the original owner of a certain 40-acre tract of timberland located in Mason County. Late in 1958, Loertscher transferred title to this timberland to the defendant-respondent, Mark Adams, who logged all of the merchantable timber and processed it into lumber at the site.

In conducting his operations on the 40-acre tract, Adams left slash and inflammable debris about the area. "Whips and Stems" (unmerchantable trees) were left standing. Around the perimeter of the logging area, he bulldozed a fire trail some 8 feet in width. Apparently it did meet the standard for such fire barriers as prescribed by state forestry officials. The land was in this condition when it was reconveyed to Loertscher early in 1959.

On August 8, 1960, a fire of unknown origin broke out in a grassy area near the perimeter of the logged-off and now slash-strewn land. The spread of the fire into and through the slash area in a west-southwesterly direction was fairly rapid, perhaps partially due to critical weather conditions, including high temperature, low humidity, and some wind from the northeast. After the fire advanced well into the slash-covered area in a somewhat confined path, leaving unburned slash on each side, according to witnesses, it increased rapidly in intensity, "seemed to explode," crowned or topped in the "whips and stems" which had been left standing near the edge of the logged area, and then jumped the fire trail and spread into the adjoining stand of timber, which was owned mostly by the Simpson Logging Company. Approximately 156 acres were burned, only 18 acres of which were on Loertscher's land.

The fire was contained, controlled and extinguished eventually by state fire fighting crews, assisted by an additional labor force summoned to meet the emergency. Thereafter, acting under the slash statute, the state calculated the fire fighting costs and billed the respondents,

who refused to pay. Failing to reach a settlement, the state instituted this lawsuit.

At the end of the state's case the defendants interposed three motions for dismissal. All were granted by the trial court, and the lawsuit was dismissed with prejudice. This appeal followed.

The state's assignments of error relating to the three above-mentioned motions raise the following questions:

(1) Whether the state produced sufficient evidence of a causal relationship between the existence of the slash, the spread of the fire, and the resultant costs of fighting the fire to require the trial court to submit the issue of the statutory liability of the defendants to the jury;

(2) whether, under the circumstances reflected in the record, the state was required to prove what part or portion of its total fire fighting costs was incurred by crews physically operating on respondents' land, and

(3) whether Loertscher, who was not the owner at the time the fire hazard was created by Adams, could nevertheless be liable for the state's fire fighting costs by allowing the condition to remain after he re-acquired the land.

We believe the first question instanced above should be answered in favor of the state. The state's evidence respecting the cause of the spread of the fire included the testimony of one Paul Armstrong, a forester of 31 years' experience in fighting forest fires. He testified as follows:

"Q. And what did you observe at that time? A. . . . Upon entering the field, the fire was probably the size of this courtroom. It was in what remained of the slabs and those slabs were really burning and then it was creeping west and just very slowly east from the original fire. The original fire was just west of the mill site as we have it (witness indicating on plaintiff's exhibit No. 4). Q. Here? A. Yes, and before we could go over the distance from the north property line down to the actual site, the fire had moved slowly into the concentrated slash between his fire trail and the slab pile and just as we were parking, the fire you might say, just exploded in height and width and started, the fire started traveling faster south and quite fast west."

And Francis Wright, the District Administrator in Charge of Fire Control for the State of Washington and the person in charge of controlling all fires on state and private lands outside of the national forests, testified as follows:

"Q. What was the effect or was there any effect upon this fire by Mark Adams fire trail, the one that you described up there, did it have any effect in stopping the fire? A. Not with the conditions of the area at that time. Q. Would you explain that a little more in detail please? A. With the fuel that was on the ground. Q. What do you mean by fuel on the ground? A. The slash, the added risk that was on the ground, these few scattered trees that were left, *the fuel created such a heat that it drove this fire up in the top of the trees.* Because of these few scattered trees, then the fire was carried across the trail, the trail wasn't effective in that case." (Italics ours.)

Another forester, with 11 years of experience, Cal Poe, testified:

"Q. Why did the fire burn over the trail left by Mark Adams? A. It was going too hot when it hit the trail. Q. How did it get so hot? A. Well, the heavy slash. Your slash and the inflammable fuel that was there burns very fast. This type of light fuel, needles, the small twigs, this type of fuel explodes, as I say, it burns real fast. It is not a heavy fuel and it will build up such a head of heat and wind that when it hits the trail, the trail wasn't wide enough to contain it and it just ran right across it. Q. Had there been no slash, would it have crossed the fire trail? A. It would be supposition on my part. There is a good chance we could have held it."

We have concluded that the state's evidence was ample to sustain a jury verdict that the slash was a major factor in the spread of the fire, and, except for this fire hazard as defined by the statute, the fire could have been controlled either by the foresters who reached the scene or by the fire trail which had been bulldozed at the edge of the area.

We think that the second question should also be answered in favor of the state of Washington. There was no necessity, under the facts and circumstances of the present case, for the state to prove what portion of its fire fighting costs was incurred on the land of Loertscher, or to

apportion the costs. Such a requirement could arise only where the slash hazard in question contributed to the spread of the fire and the resulting fire fighting costs on only a part of the total area damaged. In *State v. Anacortes Veneer, Inc.* (1961), 57 Wn. (2d) 886, 360 P. (2d) 341, the court discussed the problem of cost apportionment as follows:

"In cases where a slash hazard existed at the source of the fire and the circumstances were such that the fire would not have spread to surrounding areas had not slash remained on the originating tract, it would seem ordinarily to follow that *all* of the fire fighting would have been 'made necessary by reason of such hazard.' In such cases, the owner of the land where the fire originated and the logging operator responsible for the existence of the hazard thereon would each be liable for the whole of the state's fire-fighting costs. Pursuing our hypothetical situation, the extent of the liability of the owners of contiguous slash-covered land to which the fire spread, and of the operators who created and left slash on that land, would depend on other facts. Certainly, the costs of fighting the fire on their own land, or that logged by them, where a slash hazard was left, would ordinarily be attributable to such owners or operators. Further, however, it is conceivable that the fire might have spread from the land contiguous to the place of origin to still other land that would have been untouched but for the slash hazard on the contiguous land, thereby making necessary additional fire-fighting costs attributable to the hazards on both the land of origin and the contiguous land."

In the present case the slash hazard was confined to the defendant Loertscher's land. There were no contiguous slash-covered lands which the defendants may call upon to bear a portion of the burden of causation. Upon the jury finding that the hazard proximately caused the spread of the fire to the adjoining lands, it would follow that the defendants would be responsible for the entire costs of fighting the fire.

The final question presented by this appeal concerns only the liability of respondent Loertscher; *i.e.*, his liability for failing to abate the fire hazard after having repurchased the land in a slash-covered condition. Consideration of the primary purpose of the slash statute—the abatement of fire hazards—indicates that the statute is to be given effect by

placing upon every subsequent purchaser of land in a hazardous condition the burden of abatement. In *State v. Canyon Lbr. Corp.* (1955), 46 Wn. (2d) 701, 284 P. (2d) 316, where the constitutionality of the statute was in question, this court stated:

" . . . The slash statute is designed to provide for the removal of a hazard created by logging or right-of-way clearing operations. The sanction imposed, in the event of failure to remove, is liability for fire-fighting costs made necessary by reason of such hazard. The end sought—removal of the hazard—is within the police power of the state as it clearly tends to promote the public safety and welfare, inasmuch as public and private property and the lives of citizens are endangered by the existence of the hazard. The means employed to accomplish this end are not arbitrary or unreasonable in application. *No one is held responsible under the statute unless they create the hazard, or suffer it to remain upon their property.* . . . " (Italics ours.)

There can be no question that liability attaches both to the logger who created the hazard and to the owner of the land at the time the hazard was created. While the slash condition persists, each subsequent purchaser will acquire the land encumbered with the duty to abate the hazard and the potential liability for the fire fighting costs engendered by the failure so to do.

In view of the express purpose of the statute as adverted to in *Canyon, supra,* and *Anacortes, supra,* and the explicit language of the statute, the conclusion is inescapable that the respondent Loertscher became liable for any fire fighting costs made necessary by any slash hazard on land which he owned, whether or not the slash was a pre-existing condition at the time he acquired title to the land.

Since each of the issues or questions has been determined contrary to the conclusions reached at the trial court, the cause should be reversed and remanded for further proceedings consistent with this opinion. It is so ordered.

HAMILTON, J. and LANGENBACH, J. Pro Tem., concur.

DONWORTH, J., concurs in the result.

Ott, C. J. (dissenting)—The evidence established these facts: In the year 1958, Mark Adams owned a 40-acre tract of land, 22 acres of which were classified as agricultural land and 18 acres timber land. He logged the merchantable timber from the 18 acres, and collected and left the slash upon the logged-off land in compliance with state fire prevention regulations. Before Mr. Adams finished his logging operations, he bulldozed and constructed fire trails, designed to prevent the spread of fire from his land to the adjoining timber lands. After completing the fire trails, they were inspected and approved by the *state authorities* as being sufficient to contain any fire originating on the Adams land and hence no fire hazard to the adjoining timber land. The appellant state of Washington's evidence in this regard is as follows:

"Q. Mr. Wright, a man by the name of Mr. Needham works for you [the state department], doesn't he? A. He did work for us [the state]. Q. He did work for you? A. Yes. Q. Didn't he to your knowledge go out and inspect this area after Mr. Adams had completed his logging and completed the building of a fire trail around it and the falling of the snags? A. Yes. Q. *And didn't he report to you that that had been properly and adequately done, or did he?* A. *Yes, the report is right there.*" (Italics mine.)

In 1959, Mr. Adams sold the 40-acre tract to Ernest Loertscher. August 8, 1960, a fire which had its origin on the agricultural grass land area, burned through a part of the 18 acres of logged-off land and, because of the natural debris in the forest, the fire, aided by stiff, high winds, reached the tops of the small non-merchantable timber, leaped across the state approved fire barriers, and spread over approximately 156 acres.

The state's cost in extinguishing the fire was $10,512.02, all of which the state seeks to recover from the respondents.

At the close of the state's case, respondents challenged the sufficiency of the evidence to take the claim to the jury. The court granted the motion, holding that the state's evidence did not establish that the respondents' slash caused the fire or that the slash on the Loertscher land was left

in "such condition . . . likely to further the spread of fire, . . ." as contemplated by RCW 76.04.370. I agree with the conclusion of the trial court.

The state's evidence failed to establish that the slash *caused* the fire or that the slash was left in a condition likely to further the spread of fire for the following reasons:

(1) The fire admittedly originated on nonhazardous agricultural lands. The cause of the fire, as appellant's counsel stated in argument before the court, was a lighted match carelessly thrown in the agricultural grass area or some other cause. The evidence is conclusive that the slash did not cause the fire.

(2) The state's only evidence on the issue of whether the slash caused the *spread of the fire* across the state approved fire trails was furnished by the state's witness, Cal Poe. On direct examination he testified in answer to the question: "Had there been no slash, would it have crossed the fire trail? A. . . . There is a good chance we could have held it." Immediately, after this answer, the witness was asked on cross-examination: "I take it, Mr. Poe, that you are unable to answer that last question. You don't *know* whether or not it would have gone across [the fire barriers] or not in the *absence of that slash?* A. *No*, . . . This is an element that we don't know." (Italics mine.)

(3) Assuming arguendo that the slash did further "the spread of fire", which originated on the nonhazardous farm land, it was because the fire trails that the state supervisor had approved were not adequate. In this regard Mr. Poe further testified: ". . . the trail wasn't wide enough to contain it and it just ran right across it." The adequacy of a fire trail to prevent the spread of fire is a determination which must be made by the state supervisor. Mr. Adams stood ready and willing to construct the fire trails as the state supervisor should direct. The supervisor's agent inspected the fire trails and approved them. If a fire hazard was created by the slash on the Loertscher land, it was a condition which the state had expressly authorized.

(4) The statute provides that, where a known fire hazard exists, ". . . the supervisor may summarily cause it

to be abated and the cost thereof may be recovered from the owner or person responsible therefor, . . ." RCW 76.04.370. The supervisor had full knowledge of the condition on the Loertscher land, from 1958 to 1960, and his failure to abate it establishes that the *state supervisor* did not consider it to be such a condition "likely to further the spread of fire."

Since there was no proof of causation, and no proof that an actionable condition "likely to further the spread of fire" was created by the conduct of the respondents, the trial court correctly concluded that the state had failed to establish its claim.

The majority rely upon *State v. Anacortes Veneer, Inc.* (1961), 57 Wn. (2d) 886, 360 P. (2d) 341. In *Anacortes, supra,* the fire started by the logging operations in the slash area. In the instant case the fire started from an unknown cause in the adjacent agricultural lands. In the instant case we are concerned with the sufficiency of the evidence to establish liability for a condition which the state supervisor had approved as not "likely to further the spread of fire" and his failure to exercise his duty to abate the condition from 1958 to 1960 if he believed it to be a condition "likely to further the spread of fire". The issues raised in *Anacortes, supra,* are not apropos to the issues raised in the instant case.

In *State v. Canyon Lbr. Corp.* (1955), 46 Wn. (2d) 701, 284 P. (2d) 316, we said:

". . . No one is held *responsible* under the statute unless they *create the hazard,* or suffer it to remain upon their property." (Italics mine.)

Responsible means *answerable as the primary cause* (Webster's New International Dictionary, Second Ed., Unabridged). Every forest in its natural condition is full of broken branches, small cones, needles, new growth, unmerchantable timber and pitch which are highly inflammable. It is not this condition for which responsibility attaches. The evidence conclusively established that the high wind caused the fire to spread through the natural forest debris to the tops of the small non-merchantable timber and that

these two conditions, for which the respondents were not responsible, caused the fire to "leap" across the state approved fire barriers.

The state *failed* to prove that the slash condition was the *primary cause* or any cause of the spread of the fire across the state approved fire barriers. To assess the $10,512.02 fire fighting costs to these respondents is to fix liability without fault. Liability without fault should not be the policy of this court. Nor, in my opinion, was such intended to be the policy of the legislature when the slash statute was enacted.

For the reasons stated, I would affirm the judgment of the trial court.

\*Reported in 391 P. (2d) 964.